CASE 54—PETITION EQUITY—DECEMBER 3.

# Thompson v. Cundiff, &c.

APPEAL FROM DAVIESS CIRCUIT COURT.

1. INSURANCE OF HIS LIFE BY AN INSOLVENT HUSBAND, FOR THE BENEFIT OF HIS WIFE, IS NOT IN FRAUD OF CREDITORS—REASONABLE PROVISION FOR WIFE AND CHILDREN.

It can not be said that even an insolvent and hopelessly embarrassed husband, by setting apart for the ultimate benefit of his wife and children out of his annual earnings the sum of $125, makes an unreasonable provision for them or does an act tending to show a want of due regard for the rights of his creditors.

2. *Sections* 30 *and* 31 *of the act of March* 12, 1870, are not confined in their application to policies of insurance thereafter taken out, but include all policies in which married women are the beneficiaries; not, however, rendering valid transactions which under the former laws would, as to the creditors of the husband, have been held and treated as fraudulent and void.

3. *Contracts of insurance are kept in force from year to year at the will of the assured,* and the payment of each premium is the renewal of the contract and in a limited sense the making of a new contract.

   *Premiums paid since the act of March* 12, 1870, *was adopted,* on policies theretofore existing, come clearly within the letter and spirit of its provisions.

4. In 1868 T. had his life insured for $5,000 for the benefit of his wife. Soon afterward he was elected clerk of a circuit court, with fees between $3,000 and $3,500 per annum, and obtained additional insurance for $10,000 on his life for the benefit of his wife. He was insolvent all the while, and died in 1872, and his creditors sought to subject the insurance money to the payment of their claims. Under the circumstances of the case it was held that the insurance was not effected with any view to defraud creditors. The premiums paid after March 12, 1870, are protected by the act of that date; but those paid prior to that date, with interest, must be accounted for to the creditors.

GEO. W. WILLIAMS, }
JAMES WEIR, . . . }  . . . . . . . . For Appellant,

CITED

Revised Statutes, 2 Stanton, 246, 247, 274–8; 1 *Ib.* 246, 374–5.
General Statutes of Missouri 1865, p. 464.
Session Acts 1869–70, pp. 71, 72.
Story on Conflict of Laws, secs. 516, 106, 592, 383.
Auditor's Rep. 1869, p. 148; 1870, p. 138; 1871, p. 134; 1873, p. 160.
1 Dana, 532, Doyle, &c. v. Sleeper, &c.
2 Bush, 421, Marshall v. Marshall.
3 Bush, 352, Duhme, &c. v. Young, &c.
8 Bush, 533, Stokes & Son, &c. v. Coffey, &c.
2 Duvall, 519, Alexander v. Smith.
1 Neb. 419, Bennett v. Hargus.
14 B. Mon. 208, Moore v. Moore.
15 B. Mon. 82, Robinson v. Huffman.
21 Mich. 390, Bay City, &c. v. Austin.

JUDGE LINDSAY DELIVERED THE OPINION OF THE COURT.

John P. Thompson, now dead (being at the time insolvent), in July, 1868, caused his life to be insured in the sum of five thousand dollars ($5,000) for the benefit of his wife, Cornelia C. Thompson.

Shortly thereafter he was elected clerk of the Daviess Circuit Court for the term of six years, and at once entered into the enjoyment of that office. The legal fees of his said office amounted to between $3,000 and $3,500 per annum.

In January, 1870, he insured his life for the benefit of his said wife for the further sum of $10,000. He was still insolvent when he procured this last insurance. He died in 1872. His creditors at once asserted claim to the benefit of the amount due on these life policies. Mrs. Thompson induced the companies to make payment to her, and certain of her husband's creditors instituted this action, seeking to subject the insurance money in her hands to the payment of their claims.

They base their right to relief upon the averment that Thompson paid the premiums out of his individual means; that he procured the policies and paid the premiums thereon " with the fraudulent intent to cheat, hinder, and *delay* his creditors, and the payment of the premiums aforesaid upon said policies in favor of his wife was a withholding of his means from the payment of his just debts, and was, in fact, a fraud ʻupon his creditors; and said policies are, in so far as they attempt to secure to the said (Mrs.) Thompson the insurance aforesaid, void as to the creditors of her husband, the said John P. Thompson."

They also allege that their debts were created prior to the times at which the insurance policies, or either of them, were taken out.

Mrs. Thompson denied, in apt terms, every thing imputing a fraudulent intent to her husband, and denied that all the premiums had been paid out of his means.

Treating the taking out of these policies of insurance as amounting to a voluntary post-nuptial settlement by an insolvent and indebted husband upon his wife, these questions arise:

1. Whether they were taken out under circumstances implying the want of good faith upon the part of the husband?

2. What effect does the act of March 12th, 1870, have upon the rights of the creditors to claim either the entire insurance or the premiums paid on the policies by the husband out of his estate?

The right of a husband to make provision for his wife, even though he be insolvent and in debt, was left an open question by this court in the two cases of Doyle v. Sleeper (1 Dana, 532) and Stokes & Son v. Coffey, &c. (8 Bush, 533).

Such right is now secured by positive law. (Sections 30, 31, and 32, act March 12th, 1870; Sess. Acts 1869–70, page 71–2.) This legislative recognition was not given until after the insurance in this case was all originally contracted for, but the action of the legislative department may be considered as illustrating the fact that, in the estimation of that branch of the state government, the attempt by an insolvent and embarrassed husband to make provision for his wife and children, through the instrumentality of life insurance policies, in a reasonable sum, is not of itself a fraud upon the rights of even antecedent creditors.

Prior to the time Thompson was elected clerk he had taken out the five-thousand-dollar policy, and also a small policy in the Kentucky Southern Mutual Company for $1,650. He had contracted to pay in cash, in annual premiums not exceeding $125. He was contingently bound to pay portions of the notes given for deferred premiums; but this contingent liability, it was reasonably certain, would be extinguished by the profits on the policies, or finally deducted from the insurance when the companies were called upon to pay it. It can not

be said that even an insolvent and hopelessly embarrassed husband, by setting apart for the ultimate benefit of his wife and children, out of his annual earnings, the small sum of $125, makes an unreasonable provision for them, or does an act tending to show a want of due regard for the rights of his creditors.

The ten-thousand-dollar policy was not taken out until Thompson was in possession of an office worth exceeding $3,000 per annum. The annual cash premium to be paid on that policy was less than $350.

The annual premiums paid after this time on all the policies amounted to about $475, about fifteen per cent of the insured's annual income.

It is proved that he lived economically; that his household expenses did not exceed $1,200 per year. Allowing for incidental expenses, the proof shows that, after the payment of the cash premiums on all the policies, at least $1,000 per annum out of the fees of his office was left to be devoted to the payment of his debts, and there is nothing in this record tending to show that this surplus was not so applied.

The evidence further shows that Mrs. Thompson, on more than one occasion, permitted jewelry given to her by her parents to be pledged to raise money to pay these premiums, and that this jewelry was in pledge for that purpose at the time of the death of her husband for over $400, and that she redeemed it out of the money paid to her by the insurance companies. It further shows that the five-thousand-dollar policy would have lapsed for the non-payment of a premium falling due a few days before the death of insured except for the fact that a friend generously paid it, and prevented the forfeiture. The witness states the circumstances under which he made said payment as follows: "I paid it two or three days before his (Thompson's) death. I think the premium was on a five-thousand-dollar policy on his life, and my reason for paying

it was, I learned from Henry Yeiser that it was due and that Thompson was insensible, and I paid it to prevent its forfeiture and to secure it to his wife. I paid between $20 and $30 for her, and Mr. Weir paid it back to me for Mrs. Thompson."

We now proceed to consider the second question. But one semi-annual premium was paid by Thompson on the ten-thousand-dollar policy prior to the taking effect of the act of March 12, 1870, entitled "An act for the incorporation and regulation of life insurance companies."

The 30th section of that act provides that "a policy of insurance on the life of any person expressed to be for the benefit of any married woman, whether procured by herself, her husband, or any other person, shall inure to her separate use and benefit and that of her children, independently of her husband or his creditors, or the person effecting the same or his creditors."

Section 31 provides that "a policy of insurance on the life of any person, duly assigned, transferred, or made payable to any married woman, or to any person in trust for her or for her benefit, whether such transfer be made by her husband or other person, shall inure to her separate use and benefit and that of her children, independently of her husband or his creditors, or of the person effecting or transferring the same or his creditors."

The sole condition attached to these sections is the proviso to section 31, "That if the premium on such policy is paid by any person with intent to defraud his creditors, an amount equal to the premium so paid, with interest thereon, shall inure to the benefit of said creditors, subject, however, to the statute of limitations."

These sections are not confined in their application to policies of insurance to be thereafter taken out. The language is general, and includes all policies in which married women

are the beneficiaries. It is true the act ought not to be so construed as to validate transactions which, under the laws theretofore in existence, would, as to creditors of the husband, have been held and treated as fraudulent and void; but when, as in this case, it is shown with reasonable certainty that the husband in procuring the insurance acted from a sense of the moral duty he owed to his family and with no actual intention to defraud his creditors, the way is open for the courts to apply to the insurance held by Mrs. Thompson the expressed will of the legislature, and without wrong to her husband's creditors, to secure to her that to which, by the spirit of the law, she is manifestly entitled. This can be done because of the peculiar nature of contracts of insurance. "They are contracts to be kept in force from year to year, at the will of the insured. The right to keep the policy alive by the payment of the stipulated premiums is a privilege secured to the insured by his agreement with the insurer. He may exercise or abandon this privilege at his discretion." (St. L. M. L. Ins. Co. v. Grigsby, 10 Bush, 310.)

The moment the act of March 12, 1870, went into force Thompson could have completely defeated any claims his creditors may have had to the benefits of the insurance his wife then held by exercising his right to abandon the contracts with the insurance companies and allowing the policies to lapse. If he had elected to do this, he might at once have re-insured under the protection of the statute. Now as the payment of each premium is the renewal of the contract of insurance, a renewal which the insured may make or decline to make at his election, it is in a limited sense the making of a new contract, and such new contracts are clearly within the letter and spirit of the provisions quoted from the act of 1870. To hold otherwise would be to decide that the legislature intended to place existing policies of insurance which had been obtained with the purest motives and in the utmost good faith upon a worse foot-

ing than those subsequently procured by a husband deliberately intending to defraud his creditors.

The most that can be urged as against the contracts of insurance held by Mrs. Thompson is that to the extent her husband used his money or estate in the paying of the premiums he diverted from the payment of his debts money or estate which his creditors had the right to demand should be applied to their payment, and as no actual fraud was intended they must reach these premiums through the construction of law. The premiums paid after the 12th day of March, 1870, are protected by the act of that date. They do not fall within the proviso of section 31, not having been paid by Thompson "with intent to defraud his creditors."

The judgment requiring Mrs. Thompson to pay the debts due by her deceased husband to these appellees is reversed. The court doubtingly directs that the premiums paid on the $5,000 and the $10,000 policies prior to the 12th day of March, 1870, with interest from the date of their respective payments, shall be accounted for by Mrs. Thompson. The premiums paid on the policy in the Kentucky Southern Mutual Company are protected by the charter of that company, and will not be taken into consideration. The cause is remanded for further proceedings not inconsistent with this opinion.

Judge Cofer did not sit in this case.