THE CENTRAL NATIONAL BANK ET AL.
vs.
ANNIE G. HUME ET AL.

{ Decided December 19, 1884.
{ The CHIEF JUSTICE and Justices MAC ARTHUR and JAMES sitting.

EQUITY.   Nos. 7,906, 8,011, 8,012 and 8,013, consolidated.

1. In a proceeding in equity an administrator, where acting in behalf of the creditors, may attack a transaction of his decedent as fraudulent.
2. The claims of creditors upon the proceeds of a life insurance policy, taken out by an insolvent creditor for the benefit of his wife and children, extend only to the premiums paid by him since the date of his insolvency; after this deduction the beneficiaries are entitled to the remainder.

STATEMENT OF THE CASE.

These cases were consolidated by the order of the court. The following are the facts:

Thomas L. Hume, deceased, procured four policies of insurance on his life, as follows:

1872, April 23, from the Life Insurance Company of Virginia for...................................... $10,000

1880, March 28, from the Hartford Life and Annuity Insurance Company of Hartford, Connecticut, for.................................... 5,000

1881, February 17, from the Maryland Life Insurance Company of Baltimore for............... 10,000

1881, June 13, from the Connecticut Mutual Life Insurance Company of Hartford, Connecticut, for ....................................... 10,000

A total of.............................. $35,000

The proceeds of the policy in the Hartford Annuity were directed to be paid to his wife; and of the Virginia Company to his wife and children jointly. The policies in the Connecticut Mutual and the Maryland companies were taken out by him in the name of his wife; the proceeds of the former are made payable to his wife and children jointly, the latter to his wife, making $20,000 payable to his wife

and children, and $15,000 to the wife alone. He died on the 23d of October, 1881, utterly insolvent, and R. Ross Perry and Reginald Fendall were appointed by this court his administrators. The debts due by his estate exceeded $100,000, and the assets which came to the hands of the administrators were about $6,000.

He is shown to have been hopelessly insolvent, when the last three policies were procured, and the greatest portion of the creditors against his estate (including the parties complainant in these suits) were existing creditors at that time. He was also insolvent when the first mentioned policy was issued, but it did not appear that there was any creditor of his estate who was such at the date of this policy, or earlier than the year 1874, about two years after it was issued.

The bill in the first cause was filed by a creditor in behalf of itself and others, no administration having been taken out, the other bills were filed by the administrators. The purpose of all of the bills was the same, viz., to recover the proceeds of these four insurance policies for the benefit of creditors.

All of the premiums on the different policies were paid by the decedent, and all of the contracts of insurance were made by him.

In the answer of the widow it was claimed that the premiums were paid by her deceased husband out of money belonging to the estate of her father, or out of money belonging to the separate estate of her mother, applied as directed and requested by her mother, and that but for the amount due by her husband to the estate of her father, she would now be possessed of a much larger estate than is represented by these policies of insurance.

W. D. DAVIDGE and EDWARDS & BARNARD for the administrators and creditors.

One of the positions taken in the brief of the defendants is, that the administrators cannot sue in equity to recover the proceeds of the policies so as to apply such proceeds to the claims of creditors.

46

It is urged that the transfers and contracts for the benefit of the wife and the children are good as between parties and privies, and can only be avoided at the instance of creditors.

But even if it be assumed that the case is presented of a complete assignment valid as between parties and privies, still the administrators represent the creditors. It is manifest that the sums in controversy are wholly insufficient to pay creditors, and that, in consequence, the principle that a voluntary assignment is good between parties and privies, is in no manner involved. These proceedings, it will be observed, are in equity, and they involve only the right of the administrator to sue for the specific purpose of paying creditors. Thus the whole question is whether, in a court of equity, executors or administrators may assert the rights of creditors.

That for such purpose they represent the creditors, is beyond dispute. Hagan *vs.* Walker, 14 How., 34.

In that case the question was not whether the administrator *might*, but whether he must sue, as to allow creditors to sue might embarrass the administration. It was held that on the special grounds, which then existed, the creditor might sue ; but the right of the administrator, in that case, to sue, is distinctly maintained, and the court carefully distinguishes between a suit by an administrator at law and in equity to set aside a voluntary conveyance, by reason of the insufficiency of law machinery to confine the recovery to creditors, as may readily be done in equity proceedings. That case distinctly asserts that executors or administrators are, in equity, the representatives of creditors for the purpose of setting aside, for the benefit of the latter, fraudulent assignments, and goes farther, inasmuch as it maintains the doctrine that creditors undertaking to sue, must show special grounds therefor.

In a suit at law in this District, brought by the executor or administrator, he could recover, if at all, by virtue of his legal title, and representing as well the next of kin as creditors, he would hold the fruits of recovery for all entitled, and hence it has been held that he cannot sue at law, be-

cause to allow him to sue at law, might enable the next of kin to avoid an assignment good as between parties and privies.

When, however, even in a court of law, the capacity of the executor or administrator as representing creditors can be distinguished from his other capacity as representing the next of kin, there is no sort of objection to his maintaining a suit in the former capacity. Take, for instance, a case like the present, where all the property conveyed is required to pay creditors, and when, in consequence, the fraudulent transfer must be set aside in *toto.*

In brief, at law, the whole difficulty encountered is the result of the double character of the administrator or executor. He represents the next of kin and he also represents the creditors. In the former character he may not assail a fraudulent transfer, in the latter he may, and the machinery of a law court may not readily, or even at all, allow the right as representative of creditors to be enforced. But whatever difficulty may exist at law there is none in a court of equity where accounts can be taken and the rights of the executor or administrator, as the representative of creditors, precisely determined and defined, and where his recovery can be confined to the exact measure of such rights.

An assignment, within the statute of 13 Eliz., ch. 5, is utterly void against creditors, and the property assigned is assets for the payment of debts. 3 Williams on Ex'rs, 7th ed., 6th Am. ed., 1781, marginal page 1679, and authorities cited; Shears *vs.* Rogers, 3 B. & Ad., 362; Skarf *vs.* Soulby, 1 Mac N. & G. Ch. Reps., 364.

An executor or administrator may, as the representative of creditors, assail in equity a fraudulent transfer. Holland *vs.* Cruft, 20 Pick., 321, cited and approved in Hagan *vs.* Walker; Welsh *vs.* Welsh, 105 Mass., 229; Chase *vs.* Reading, 13 Gray, 418; Caswell *vs.* Caswell, 28 Maine, 232; Gibbons *vs.* Peeler, 8 Pick., 253; McLane *vs.* Johnson, 43 Vt., 48.

And also at law. McLean *vs.* Weeks, 61 Maine, 277; Martin *vs.* Roots, 17 Mass., 222; Buechler *vs.* Gloninger, 2

Watts, 226; Stewart vs. Kearney, 6 Watts, 453; Minor vs. Mead, 3 Conn., 289; Andrews vs. Doolittle, 11 Conn., 283.

The proceeds of these contracts of insurance belong to the creditors. The insolvency of the insured is clear. It is also clear that he paid the considerations for the different contracts. The moneys so paid belonged to his creditors. The sums in controversy are by convention with the insurers the equivalents or earnings of such considerations. Had he bought a farm or a ship on the same terms, that is, by periodical payments *during* his life, and the payments to cease at his death, the thing so bought would belong to creditors; as he could not give away property in specie, so he could not give away property in contract. He was bound to be just before he was generous. There is no difference between the proceeds of a contract of life insurance and the proceeds of any other contract. It is true that the considerations paid were small compared with the sums earned, but that is owing to the terms of the contracts, and the uncertainty of life. The validity of the contracts is not in question, but conceded, and had the insured, a young man, survived many years, the contracts obliged him to continue to make payments or forfeit the sums insured, so that the fact that he paid but a small amount is attributable solely to the accident of early death.

The decisions are uniform that the voluntary transfer of the proceeds of a contract of life insurance stands on the same footing as the voluntary transfer of any other contract or property, and is void in respect of creditors. Bliss, Life Ins., §§ 323, 353; May, Life Ins., 590; Bump, Fraud. Conveyances, 239; Wait, Fraud. Conveyances, § 24; Pullis vs. Robinson, 73 Mo., 201; Stokes vs. Coffey, 8 Bush. (Ky.), 533; Appeal of Elliott's Ex'rs, 50 Pa., 75; In re Anderson's Estate, 85 Pa., 202; Barry vs. Eq. L. Ins. Co., 59 N. Y., 593; Rison vs. Wilkerson, 3 Sneed (Tenn.), 568; Hathaway vs. Sherman, 61 Maine, 475; Catchings vs. Manglove, 39 Miss., 655; Stokoe vs. Cowan, 29 Beavan, 637; Skarf vs. Soulby, 1 Mac N. & G. Ch. Reps., 364.

They are executory contracts; choses in action—

"Policies are choses in action, governed by the same principles applicable to other agreements involving pecuniary obligations." Bliss on Life Ins., sec. 308; citing, St. John vs. Am. Mut. L. Ins. Co., 2 Duer, 419; Same Case in 3 Kern., 31; Palmer vs. Merrill, 6 Cush., 282; Ashley vs. Ashley, 3 Simons, 149. See also, Ins. Co. vs. Sears, 109 Mass., 383; Burton vs. Farinholt, 86 N. C., 260; Appeal of Elliott's Ex'rs, 50 Pa., 75; Catchings vs. Manglove, 39 Miss., 655.

The insured undertakes and agrees to pay during his life an annual uniform amount, in consideration of which the company or corporation undertakes to pay a fixed sum at his death to his legal representatives, or to his appointee, or beneficiary designated in the policy, or contract, as the case may be.

The annual premiums or payments agreed to be made are generally small compared with the amount to be paid at death of the insured; the agreements, are, nevertheless, mutual, based upon the expectancy or duration of the life of the insured, through well ascertained sources of information and experience.

"The contract, commonly called life insurance, when properly considered, is a mere contract to pay a certain sum of money on the death of a person, in consideration of the due payment of a certain annuity for his life, the amount of the annuity being calculated in the first instance, according to the probable duration of the life, and, when once fixed, it is constant and invariable." May on Insurance, sec. 8.

The insured in the case under consideration was, comparatively, a young man; he was in his forty-second year when he took out the last three policies. When the first was procured, in 1872, he was only thirty-three years of age. He was of strong physique and in good health.

The expectancy of his life under the authority of the "Carlisle," or other actuary tables of acknowledged merit and reliability, was as follows:

At the time he procured the first policy, thirty-two years. The other three, twenty-five years.

By the first contract his obligation under the expectancy stated was to pay $230.80 annually during thirty-two years, an aggregate sum of $7,385.60.

Under the provisions of the three last policies about $800 more annually for twenty-five years, or an aggregate sum of $20,000.

Making, under the terms of all the policies, his annual payments during his life about $1,000, or $27,000 in round numbers in all; which, with average interest, would yield the companies about $48,000—some $13,000 more than the amount stipulated to be paid by them.

The thing settled was the contract entered into by the husband, purchased by him and paid for with his own means when insolvent; and, being voluntary, is void as to existing creditors.

There is no difference, in principle, between the purchase and voluntary settlement by an insolvent of a life insurance policy, and the purchase and settlement of an annuity. In the latter the settlor purchases for a large sum a contract, or chose in action, which yields him annually, during the life of another, a smaller amount; and in the former he secures a contract, by the terms of which he is to pay a smaller sum annually during his own life in consideration of the payment to his beneficiaries of the larger amount at his death.

Annuities in the hands of volunteers, settled when the donor was insolvent, are liable to the demands of creditors, and can be recovered in equity. Wait on Fraud. Con., sec. 24; Norcutt *vs.* Dodd, 1 Craig & Ph., 100; Degraw *vs.* Glason, 11 Paige (N. Y.), 136.

Under the provisions and operation of the Statute of 13 Eliz., and the principles of the common law (of which this statute is merely declaratory), every description of property, in specie or contract, of value, corporeal and incorporeal, vested or contingent, in possession or expectancy, of an insolvent debtor, no matter how settled, or given, or appro-

priated to the use or benefit of, or acquired by, the voluntary donee, is liable to the claims of creditors, and can be reached and applied to satisfy their demands. Bump on Fraud. Con., pp. 238 to 244, and p. 532; Wait on Fraud, Con., sections 24 to 45; and authorities cited by both authors.

The doctrine contended for by defendant's counsel in their supplemental brief, that policies of life insurances, of the character under discussion, being *choses in action,* cannot be held to be included in the statute mentioned, under its most liberal interpretation, is not law, and is contrary to the whole current of authority as announced by the elementary writers, and by every court of last resort—except in one single instance in the State of Louisiana, where the civil law is in force—where the question has been presented for judicial determination.

The cases cited by defendant's counsel in their briefs (except the Louisiana case, and in which there is a strong dissenting opinion by the chief justice of the court) are not authorities to the contrary.

The concluding remarks of the court in the case of Elliott's Appeal, 50 Pa., are *obiter dictum.*

In Anderson's Appeal, 85 Pa., 202, the case turned upon the provisions of a statute exempting the proceeds of policies from the claims of the creditors of insolvents, then in force, and has no application.

The case of McCutcheon's Appeal, 99 Pa., 133, also came up for consideration under the provisions of the same statute.

In Pence's Admr., *vs.* Makepeace, 65 Ind., 345, in which State a similar statute as that in Pennsylvania was then in force, the court says:

"We need not and do not decide in this case, what effect, if any, the alleged insolvency of James T. Makepeace might possibly have upon the appellee's title to the policy of insurance or to the money derived therefrom; for that question was neither tried nor decided by the court below, in this case, *nor is it presented by the record of this cause for our decision."*

The court in the case of Thompson *vs.* Cundiff, 11 Bush.,

(Ky.,) 569, decreed that the creditors should have the premiums paid during the husband's insolvency prior to the law of that State, passed March 12, 1870, (which was also similar to the Pennsylvania statute), on the theory that the policies "are contracts to be kept in force from year to year, at the will of the insured. The right to keep the policy alive by payment of the stipulated premiums, is a privilege secured to the insured by his agreements with the insurer. He may exercise or abandon this privilege at his discretion." (p. 573).

The court holding substantially that a liberal construction of the statute brought the policies in controversy in that case within its provisions. Moreover, the court found, as matter of fact, that the wife raised money herself to pay the premiums, on the pledge of jewelry given to her by her parents; that this jewelry was in pledge for that purpose, at the time of the death of her husband, for over $400, and that she redeemed it out of the money paid to her by the insurance companies. It also appears that one of the policies for $5,000 would have lapsed for the non-payment of a premium falling due a few days before the death of the insured, while he was insensible, except for the fact that a friend generously paid it, and prevented its forfeiture. Pp. 571 and 572.

The Louisiana case stands alone in denying the rights of creditors to recover the proceeds of life insurance policies taken out by an insolvent debtor. No case can be found where it has been decided that the premiums only can be reached by creditors.

The donor being insolvent the gifts of these contracts of insurance are necessarily void.

The theory of the law is that the voluntary donee holds the property as a trustee for the creditors to the extent of their demands. Bump on Fraud. Con., p. 241, and authorities cited.

In equity the *cestuis que trust* are the real owners.

The thing given or settled is what the donee holds as such trustee, and the recovery, so far as the creditors are con-

cerned, is that thing or its proceeds, not what it cost the fraudulent donor, or the price he paid for or expended on it.

Any other doctrine would be absurd, and would, if established, make fraud, in many instances, quite profitable, and, it is submitted, that there is no authority in the books to the contrary.

To illustrate—

The insolvent debtor secures a valuable patent at the nominal expense or fee prescribed by the Patent Office and takes out the patent in the name of his wife to cheat his creditors; will it be contended that the trust in the wife as to the creditors, created by the law, extends only to the money actually paid to secure the patent, and not to the patent itself; or, if sold and the proceeds invested in other property (no matter how valuable, or how great the profit through the change), that the same trust does not attach to the property thus acquired? The same may be said of book royalties, trade-marks, seats in stock exchanges, lottery tickets, stock margins, growing crops, powers of appointment, and the like.

The trust being established, the law gives to the creditor (the beneficiary) the full benefit of the property or contract, and equity will compel the trustee to account for the proceeds realized, however great, which were produced by the means of the donor, however small.

It is a familiar rule of equity that a trustee shall not profit by his trust.

Upon principle, and upon consideration of public policy, the recovery by creditors should not be limited to the premiums alone, but, to the extent of their debts, to the proceeds realized, or thing held by the involuntary donor acquired through the means of their insolvent debtor.

ENOCH TOTTEN and GORDON & GORDON for defendants:

The administrators of an intestate's estate are estopped from assailing a contract or transaction made by the intestate in the same manner as he himself would be if living,

47

and they can in no emergency charge fraud as against his acts.

There is a statute of Maryland in force in this District on this subject as follows:

"*Provided always*, That nothing in this act shall extend or be construed to extend to make void any such sale, mortgage or gift against such seller, mortgagor or donor, his executors, administrators or assigns, or any claiming under him, her or them." (Act of Md., 1729, Chap. 8, Sec. 6).

The Court of Appeals of Maryland, in Dorsey vs. Smithson, (6 H. & J., 61), held that the statute of 1729, above referred to, did not make void contracts, by that act condemned, so far as the contractor, his executors, administrators and assigns, and those claiming under them, were concerned, and declared that it was so, too, at the common law. That case was replevin, and it was held that the executor could not defend on the ground of fraud even though he was himself a creditor. This was affirmed in Allien vs. Sharp, (7 G. & J., 96). See also Goodrich, Adm'r, vs. Treat, (3 Colo., 408); Bump on Fraud. Con., 444, (note), 3d Ed.; Davis vs. Swanson, 54 Ala., 277; Kinnemon, Admr. vs. Miller, 2 Md. Ch., 407; Choteau vs. Jones, 11 Ill., 310; Catherine Tierney vs. Corbett, 2 Mackey, 264.

In Crossfield, Admr. vs. Edwards, Admr., (G. T., July 2, 1883), Cox. J., speaking for the court, said: "In no case can an administrator sue for the benefit of creditors." See also, Relief Association vs. McAuley, 2 Mackey, 70.

Every case relied upon by counsel for the complainants, on this point is founded upon a statute, except the case of Hagan vs. Walker, (14 How., 34), and that case involved no such question. It arose in Alabama, and the law there is firmly established the other way. (See 54 Alabama, 277).

This being the rule established in Alabama by the State courts, the Supreme Court of the United States will inflexibly follow those decisions. Christy vs. Pridgeon, 4 Wall., 196; Leffingwell vs. Warren, 2 Black., 603; Shelly vs. Gay, 11 Wheat., 367; League vs. Egery, 24 How., 266.

The wife may be a creditor, and is included in the desig-

nation "and others" in the statute of 13 Eliz., ch. 5.   Finley vs. Finley, 7 Md., 537; Dimmick vs. Dimmick, 3 Md. Ch. Dec., 140; Alex. Br. Stat. [note], 404; Rider vs. Kidder, 10 Ves., 560; Woodworth vs. Sweet, 51 N. Y., 9; Syracuse Co. vs. Wing, 85 N. Y., 421; 51 N. Y., 626; Bishop on M. W., sec. 119; Hyde vs. Powell, 47 Mich., 156.

As to the position of the wife as "creditor" of her husband, because he has used her funds for his own purposes, see In re Wood, 5 Fed. Rep., 443; In re Corse, 2 Fed. Reporter; Glidden vs. Taylor, 16 Ohio St., 509; Oliver vs. Moon, 26 Ohio St., 298; Kaufman vs. Whitney, 50 Miss., 103; Story's Eq., 1373; Wells' Sep. Estate, § 172; Crum vs. Barkdall, 10 Md. L. Rec., No. 6.

Under our "married woman's" act the wife may deal with her husband.   Sykes vs. Chadwick, 18 Wall., 141.

The husband may allow his wife to retain her separate personal property, and if he borrows her money, or uses it for his own purposes, there is a valid consideration in equity to repay it.   A promise to repay money so borrowed or appropriated by the husband cannot be regarded as *nudum pactum*.   (Woodworth vs. Sweet, 51 N. Y., 9, and cases there cited; Syracuse Co. vs. Wing, 85 N. Y., 421.)   In the case last cited, Wing received $1,366.00 from the guardian of his wife in 1844, money inherited by her from her father's estate. The married woman's act of New York became a law in 1848. This money was relied upon for the consideration to uphold, as against creditors, a mortgage made in 1878.   The testimony showed that the husband and wife subsequently had conversations in reference to this money, to the effect that "the money was her's, and that she should have it."   The court sustained the mortgage and said, "if the money was received by the husband as his wife's, or to be accounted for or secured to her, he waiving his marital rights thereto, she had an equitable right to the fund, sufficient to sustain the mortgage, which he subsequently gave to secure it, and the mere lapse of time would not invalidate the security. Citing 51 N. Y., 9, 395; 24 N. Y., 623; 51 N. Y., 626; 1 Bishop on M. W., sec. 119.   The Supreme Court of Michi-

gan recently placed a wife in the attitude of a creditor, her husband having used her money to buy real estate, the title to which he took in his own name, and upheld a conveyance, as against creditors, made by the husband for her repayment. Hyde *vs.* Powell, 47 Mich., 156; and see Harvey *vs.* Alexander, 1 Rand., 219.

The foregoing doctrines relating to the rights of a married woman, as against creditors, in a case where her estate had been used by her husband, has recently been asserted with much force by the Supreme Court of the United States in the case of Hitz *vs.* National Met. Bank, 110 U. S.

A debtor may lawfully prefer one creditor over others. Glenn *vs.* Grover, 3d Md., 212; Alex. Br. Stat., 381.

Subsequent creditors cannot complain of a fraudulent conveyance. See Kipp *vs.* Hanna, 2 Bland, 26; Alex. Br. Stats., 402; Wood *vs.* Hollins, 14 Md., 158; Crozier *vs.* Young, 3 B. Mon., 158; Roberts on Fraud. Con., 463; Croke Car., 550; Graham *vs.* La Crosse R. R. Co., 102 U. S., 148.

The proceeds of a policy of insurance issued on the life of a husband payable to the wife, or to the widow and children, cannot constitute a fund for the payment of the deceased husband's creditors. To devote such a fund to this purpose is contrary to public policy, and would be equivalent to a mortgage upon human life. Warnock *vs.* Davis, 104 U. S., 775; Page *vs.* Burnstine, 102 U. S., 664; 26 La. Ann., 326; Cammack *vs.* Lewis, 15 Wall., 648; Baker *vs.* Union Mutual, 43 N. Y., 283.

In a case in Louisiana, the court says:

"A husband has the right, we think, to insure his life in the interest of his wife and children as well as in the interest of his creditors, and his obligation to provide for them in case of his death is certainly well recognized. If the policy issues to the wife, or is properly transferred to her, the amount stipulated therein belongs to her when the event insured against happens, and she cannot be forced to inventory it as part of her husband's estate. * * * It is the wife whom the husband seeks to protect, when he insures his life in her behalf; otherwise he would not insure

in her name. He has no need to protect his creditors by such a mode, for they can protect themselves. A creditor may have the life of his debtor insured, even without the consent of his debtor." Succession of Hearing, 26 La. Ann., 326.

In Elliott's Appeal (50 Pa. St., 75), it was held that policies of insurance effected without fraud directly and on their face for the benefit of the wife, and payable to her, are not to be held fraudulent as to creditors. The court declares with emphasis, that "*such policies are not fraudulent as to creditors.*" See also Thompson *vs.* Cundiff, 11 Bush, 569; Pence's Adm'r *vs.* Makepeace, 65 Ind., 345.

Where fraud is charged against a conveyance, proof must show that both parties are guilty of fraud; fraudulent knowledge and intent of one is not sufficient. Prevost *vs.* Wilson, 103 U. S., 22.

A policy of insurance on the life of a husband, issued upon the application of the wife was made payable to the wife for her sole use and in case of her death before her husband's to be paid to her children. She died before her husband, leaving children. After her death the husband surrendered the policy and took out another for the same amount in his own name, and for his own sole benefit, the new policy being upon the same premium and dated back so as to be of the same date with the other. After paying one year's premium in the new policy, the husband died insolvent. Held, that in equity the substituted policy belonged to the children, and that they and not the creditors of the husband were entitled to the insurance money. Chapin and others *vs.* Fellowes, Administrator, 36 Conn., 132.

These contracts are by their terms, either directly, or by implication, to be executed at the places where the companies are severally located, and hence are governed by the stipulations contained in each, and by the special State statutes relating to life insurance policies.

The certificates of the Hartford Life and Annuity Insurance Company are payable to Mrs. Hume, "at the home office of said company," within ninety days after the receipt

by the company of the "proofs" of death and "upon presentation and surrender of" the certificates. Upon receipt of proofs of death, the president of the company is required "to make an assessment for as many dollars as there shall be similar certificates" outstanding "on the holders thereof." See, also, the contract of trust with the security company. This "assessment" is to be made in Connecticut and not here.

The fourth section of the act amending the charter of the said Hartford Life and Annuity Company provides as follows:

"Said company may issue policies for the benefit of and payable to any married woman or child or children; and any contract of insurance thus issued, by whomsoever the same may have been procured, shall be, to the extent expressed in the policy, the sole and separate estate of the married woman, child or children, to whom the policy, by its terms, may be payable. And the discharge of such policies by such married woman or her assigns, or by such children (or the guardians of minors), shall be a valid discharge of the same."

A like provision in the charter of a company in Kentucky was held (in a case relied upon by the complainants) to exempt the proceeds of a policy from the claims of creditors. Thompson vs. Cundiff, 11 Bush, 567.

The Connecticut Mutual Life Policy provides for its payment, and also the premiums, "at the office of this company in Hartford, Conn.," in ninety days.

It also contains this provision, to wit:.

"It is agreed that this policy is issued and delivered at Hartford, in the State of Connecticut, and is to be in all respects construed and determined in accordance with the laws of that State."

The policy issued by the Maryland Life Insurance Company and the premiums are made payable at the office "in Baltimore."

These contracts are made in reference to the laws of Connecticut and Maryland, and are to be executed there. The

subject of insurance did live in the District of Columbia; but it does not follow that the subject of a life policy shall always continue to reside at one place.   It therefore cannot be said that the policy had reference to the laws of the District of Colunbia, any more than to the laws of any other place to which the subject might emigrate.   Norton *vs.* Pritchard, 106 U. S., 129; Gallaudet *vs.* Sykes, 1 Mac A., 489; Railroad Company *vs.* Bartlett, 14 Gray, 214; Cooley on Con. Lim., sec. 285; Gebhart *vs.* Railroad Company, 109 U. S., 527; Spratley *vs.* Insurance Company, 11 Bush, 443.

A policy of life insurance issued upon the life of a husband and payable, by its terms, to the wife, or to the wife and children, cannot be held to be included in the designated property mentioned in chapter 5 of 13 Elizabeth, and classified as "lands, tenements, hereditaments, goods and chattels," nor a *chose in action*, under the most liberal interpretation of that statute, as it is in force in this District. That statute is as follows:

"Be it therefore declared, ordained and enacted by the authority of this present Parliament, that all and every feoffment, gift, grant, alienation, bargain and conveyance of lands, tenements and hereditaments, goods and chattels, or any of them, or of any lease, rent, common or other profit or shares out of the same lands, tenements, hereditaments, goods and chattels, or any of them, by writing or otherwise; and all and every bond, suit, judgment and execution, at any time had or made, either since the beginning of the Queen's Majesty's reign that now is, or at any time hereafter to be had or made to or for any intent or purpose before declared and expressed, shall be from henceforth deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every of them, whose actions, suits, debts, accounts, damages, penalties, forfeitures, heriots, mortuaries and reliefs, by such guileful covinous, or fraudulent devices and practices, as is aforesaid, are, shall or might be in any wise disturbed, hindered, delayed or defrauded) to be clearly and utterly void, frustrated, and of no effect, any pretence,

colour, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding." Alex· Br. Stat., 278.

The interest which the wife has in her husband's life, is in no sense property. It is not tangible, and cannot be reached by any process known to the law.

Story, in his work on Equity Jurisprudence, declares the law, as applicable to this statute (13 Eliz., ch. 5), to be as follows:

"The English doctrine upon this subject, after various discussions, has at length settled down in favor of the former proposition, namely, that in order to make a voluntary conveyance void as to creditors, either existing or subsequent, it is indispensable that it should transfer property, which would be liable to be taken in execution for the payment of debts. The reasoning by which this doctrine is established. is, in substance, that the statute of 13 Elizabeth did not intend to enlarge the remedies of creditors, or to subject any property to execution, which was not already, in law or equity, subject to the rights of creditors. That a voluntary conveyance of property not so subject, could not be injurious to creditors, nor within the purview of the statute, because. it would not withdraw any fund from their power which the. law had not already withdrawn from it. And that would be a strange anomaly, to declare that to be a fraud upon creditors which, in no respect, varied their rights or remedies. Hence, it has been decided that a voluntary settlement of stock, or of choses in action, or of copyholds, or of any other property, not liable to execution, is good, whatever may be the state and condition of the party as to debts." 1 Story's Eq., § 367.

Subsequently this doctrine was denied in the well known case of Bayard *vs.* Hoffman (4 John. Ch., 452). This denial called forth from Judge Story the following language, which. was appended to the section above quoted (See 1 Story's Eq., § 368, note):

"Whatever may be the true doctrine on this subject, a distinction may, perhaps, exist between cases, where a party

indebted actually converts his existing tangible property into stock to defraud creditors, and cases where he becomes possessed of stock without indebtment at the time; or, if indebted, without having obtained it by the conversion of any other tangible property. Where tangible property is converted into stock to defraud existing creditors, there may be solid ground to follow the fund, however altered."

The contract of life insurance is a contract of indemnity. and nothing more, and it contains a promise to pay a sum certain on the happening of some specified future event. The policy is not the contract, but only the evidence of it. Glantz *vs.* Gloecker, 104 Ill., 573; Succession of Hearing, 26 La. Ann., 326.

The premium constitutes no part of the policy, and does not belong to, or constitute any part of the money payable on the happening of the event, any more than does the consideration paid to a guarantor who agrees to stand for the debt of another form a part of the debt which he is called upon to pay on default of the person against whose default he warranted. Succession of Hearing, 26 La. Ann., 326; Pence *vs.* Makepeace, 65 Ind., 345 ; Glanz *vs.* Gloecker, 104 Ill., 573.

For the same reason the surrender value of a life policy is wholly separate and distinct from the fund which may become payable upon the death of the assured.

These propositions being found to be true, what property, goods, chattels or choses in action were fraudulently transferred when the husband in this case paid $242 for the premium on the Maryland policy and received the policy?

If any chose in action, goods or chattels passed, to whom did they pass? Did the assured transfer anything to his wife, and, if so, what? She received no money; the company received the premium.

It is submitted that in no case can the creditors reach anything beyond the premiums, as was partially permitted in Thompson *vs.* Cundiff 11 Bush, 567, and that in this case they can recover nothing.

All the cases relied upon by the complainants to uphold

48

the contrary of this doctrine last stated, are cases arising upon statutes, except the case from Missouri.

. A case arising on an assignment to the wife of a perfected policy, issued to and payable on its face to the husband, can have no application here. Such a policy has a surrender value, and perhaps may be called property or a chose in action, and it possibly may be reached by creditors.

Mr. Justice MAC ARTHUR delivered the opinion of the court.

In the case of the Central National Bank of Washington against Hume, with which case three others are consolidated, the court has instructed me to announce its decision.

The suits are against four different insurance companies, and the object is to subject the proceeds of the policies to the payment of creditors and to include them among the assets of the deceased intestate.

. There are two or three preliminary questions which were discussed at some length during the hearing, and which can be disposed of without much observation. One relates to the parties. The Central National Bank, it appears, was the owner of three notes, perhaps four, and it is said all of these notes have been secured, and all of them have been paid but one, and that is secured by endorsement, and that, therefore, the Central National Bank cannot maintain a pure creditor's bill where it holds security for its indebtedness. It was also argued that an administrator is estopped from attacking the transactions of his intestate as fraudulent.

Another point which was argued in this connection, relates to the consolidation of the suits, and a motion was made to rescind the order consolidating them, because the defendant alleges that he is injured by that order, and that it was passed without his consent, and in his absence. The court have come to the conclusion, without discussing those points, to decide them all against the defendant and in favor of the plaintiffs.

The policies involved in this suit were issued by the Life Insurance Company of Virginia, on the 23d of April, 1872,

for $10,000; by the Maryland Life Insurance Company, on February 17, 1881, for $10,000; by the Connecticut Mutual Life Insurance Company, June 9, 1881, for $10,000, and by the Hartford Life Annuity Company for $5,000. Two of these instruments were made in the name of Mrs. Hume, and all were made for her benefit and payable to her.

The ground upon which the complainant proceeds is that Mr. Hume, at the time these policies were effected, was insolvent; that the premiums were paid out of his means, and that they, therefore, insured to the benefit of the creditors, and came under the provision of 13th Elizabeth, which is the law of this District.

It is argued that a policy of insurance is a chose in action, and when issued to the husband belongs to his estate; and that it makes no difference as to creditors whether it is taken in his own name or that of his wife so long as he paid the premiums thereon. Numerous cases are cited to show that it is assignable and transferable like any other piece of property, and if transferred when insolvent, for the purpose of hindering, defrauding or delaying his creditors, it was subject precisely to the same course as any other property which he might have transferred for the same purpose.

The broad assertion that a policy of insurance upon which premiums have been paid is a chose in action, is to be taken with a good deal of limitation. Judges and courts have spoken of them commonly and generally as choses in action like bonds and promissory notes, going to his administrator and assignable in the market during his life time. This is scarcely so in an unlimited sense. A promissory note represents an existing indebtedness. A bond does the same. A policy of insurance does not and cannot until the death of the assured party takes place.

The Supreme Court of the United States have recently decided that a policy of insurance cannot be assigned to any one not having an insurable interest in the life of the assured. The Supreme Court of the State of New York have decided that a policy of insurance effected for the benefit of the wife, is not assignable at all, holding under their statute

that allows a husband to insure his life for the benefit of his wife and children free and clear from the claims of his creditors, that it would be against public policy to allow a wife to traffic in that which was consecrated to the benefit of the family.

Many of the States, indeed most all of them, have enacted laws by which a husband can assure his life for the benefit of his family free and clear from all liability to his creditors; and I have no doubt that upon a proper construction of these statutes, the States where they have been passed will ultimately arrive at the same conclusion reached by the Court of Appeals of the State of New York. And the tendency of the decision in the Supreme Court of the United States, judging from the one to which I have just referred, is in that same direction.

So that we see a policy of insurance has many disabilities that do not belong to choses in action generally, and that it is the tendency of legislation, as well as of judicial construction, to invest it more and more with those attributes that will give it the effect it was intended to subserve, to wit, the protection and settlement of families.

I have stated that the policies here were effected for the benefit of the wife, and two of them made directly in her own name. What is the effect upon a policy of that description growing out of the fact that the husband at the time he undertakes to make the provision is in embarrassed circumstances? That is the main question before us.

As I have stated, many cases have been referred to which establish the doctrine, that when the husband effects the policy in his own name, it goes to the benefit of his creditors, and it is sought to apply that principle to this case. But Mrs. Hume did not derive anything by assignment, nothing by transfer. What she claims under this policy never belonged to the estate of her husband, never formed an asset or a basis of credit. The proceeds of the policies stand entirely in a different relation to his estate from a contract directly with himself; he never had any control of them; he never could assign or transfer them. The decisions are

to the uniform conclusion that the moment a policy of insurance is effected for the benefit of a wife upon the life of her husband, it becomes her property *eo nomine*, and nobody has control of it but herself. She may assign it, unless there is some public policy against it, and it is just as much a vested right in the married woman as any other portion of her separate estate.

Can the fact that her husband paid the premiums deprive her of this vested right without any act on her part to forfeit it?

It is not pretended that Mrs. Hume was aware of her husband's insolvency, or that he intended to hinder and delay his creditors. She stands in the position of a perfectly innocent person, unaffected by anything corrupting the contract of insurance.

There is a decision in Kentucky, that of Stokes & Son *vs.* Kobbe, 8 Bush, 534, where three policies of insurance were effected in the name of a married woman. With regard to one of them, the court came to the conclusion that it was an assignment in point of fact, although in her name, and gave the proceeds to the creditors of the husband who was insolvent.

With regard to another, they allowed the wife to take the money because it did not clearly appear that the husband was insolvent when he paid the premiums. But with regard to the smallest of the three, the court held that inasmuch as the husband had taken it out and paid the premiums himself, it stood the same as if it had been taken out in his own name, and they allowed the creditors to assert their claim to the proceeds of the policy.

But the effect of that decision is entirely neutralized by the fact that the same court, four years afterwards, in the case of Thompson *vs.* Cundiff, 11 Bush, 569, declared exactly the opposite doctrine. That was where an insolvent husband took out two policies of insurance in the name of his wife, and the court held that, in the absence of fraud on the part of both the husband and the wife, the interest in the policies vested in the wife as her sole and separate property,

notwithstanding the fact that her husband was insolvent at the time he effected them, and, to use their own words, they doubtingly gave the creditors the benefit of the premiums which he had paid during the period of his insolvency, together with interest thereon, which amount they charged on the widow.

It is a curious fact that wherever it has been claimed that an insolvent debtor can do nothing for the protection of his family, the State legislatures have stepped in immediately and enacted laws to the effect that a policy can be effected for the benefit of a married woman free and clear of any claim of her husband's creditors. In some of the States the amount of the premiums is left at large, but in others they have put limitations on the premiums, beyond which an insolvent husband cannot insure his life for his family. In Kentucky when the supreme court announced this obnoxious doctrine, they passed a law of that description, and that law was passed during the interval between the two cases which I have just alluded to; and the fact that the law is referred to by the court in the last case, who say that they do not mean to determine that a policy void as to creditors at the time it was effected, is protected at all by the State law, and so they proceed to decide the case upon principles applicable at common law, and hold the doctrine which I have last announced.

So far as Kentucky is concerned we have her last voice, and probably it will be the last as her legislation has ended all dispute on that subject.

At an early day the Supreme Court of Pennsylvania had this same point before them in Elliott's Appeal, 50 Penn., p. 75. There a husband had effected a policy in his own name, and assigned it to his wife when he was insolvent, and the court held that the assignment was void and the creditors had the benefit of the policies. In closing that opinion, however, the court made a distinction, and they say:

"We are to be understood, in thus deciding this case, that we do not mean to extend it to policies effected without fraud directly and on their face for the benefit of the wife

and payable to her. Such policies are not fraudulent as to creditors, and are not touched by this decision."

The legislature in Pennsylvania, seeing that there might be uncertainty on this question, interposed within two years and passed one of the acts to which I have just referred, and they declare that a policy taken in the name and for the benefit of a married woman is free and clear from all claims of all creditors of her husband.

Two cases in Pennsylvania follow that in which that statute was recognized, but in which they give effect to the *obiter* in Elliott's Appeal, and in speaking of it they adopt it as a true exposition of the doctrines laid down so far as the policies for the benefit of the wife are concerned.

In the case of Pentz, administrator, against Makepeace, 65 Indiana, 3 ,5, the first clause of the syllabus reads:

"An insurance policy issued upon the life of a husband for the benefit of his wife, is her property, and an effectual assignment and delivery thereof to another during the lifetime of the husband, can be made only by her."

And in the opinion they hold the following language:

" If, however, it were conceded (which we do not concede) that the creditors of the assured might in any case institute and maintain an action for the recovery of any part of the amount of a policy of insurance procured by an insolvent debtor upon his own life, for the benefit of his wife or family, upon the ground that the premiums therefor were paid with money which ought to have been applied to the payment of the debts of the assured to such creditors, and that such payment of such premiums by the assured was a fraud upon the rights of such creditors, we are clearly of the opinion that the very utmost which the creditors could possibly recover in such action would be the aggregate amount of the premiums thus paid. The creditor could not, in any event, derive a profit from, or recover on, more than the sums of money actually paid by the debtor in premiums upon a policy of insurance upon his own life payable to or for the benefit of his wife or any member of his family."

And such appears to be the whole current, both judicial and legislative, on this subject.

We are disposed to apply that doctrine to this case. A considerable number of authorities were read upon the argument as to the sacredness of the claims of creditors, and as to the injustice of depriving them of the benefit of the property of their debtors, and such observations were undoubtedly justified by the cases in which they were pronounced. In fact, we are all very familiar with the general strength of language in which the relation is discussed which exists between the creditor and the debtor. Many other relations, however, are equally important; the relations which a man bears to his wife and to his family, for instance. We do not, I am very sorry to say, generally find the courts so emphatic in regard to the latter species of relations as to the former. Perhaps that results from the fact that courts are more generally engaged in adjudicating pecuniary rights than those of a social character. But the rights which result from the family relations are certainly quite equal to those which result from debtor and creditor. You might blot out every law and extinguish every right for the collection of debts, and the community would scarcely feel the shock. But if you abrogated the law of marriage and its relations, you would not only rupture the moral, but also the physical organization of society. Where, therefore, the two claims come in conflict, the courts should adjudicate between them with justice and fairness to both.

When a man has made provision for his wife, the law recognizes that he has performed a social and moral duty. The state has a deep interest in having families of healthy children properly educated and settled in life, as well as to have creditors paid what is due, and whatever will promote that object should receive its due share of attention.

These remarks are made more especially because we can distinguish here between the rights of the creditors and the rights of the family, and do justice to both of them. What right have the creditors to what never belonged to the estate? What right have they to a vested right in a mar-

ried woman for her protection and that of her family? What right have they to a species of property that never existed until after the death of the husband? We presume that no creditor of Thomas L. Hume would dare to stand up and make the statement that he had been misled by these policies, or that he had extended credit to him on their strength.

So that it strikes the court very forcibly that where we can protect a settlement on a family, by giving back to the creditors all that has been taken from them, we are doing justice and equity to all, and the creditors have a right to demand no more.

There are some considerations which lead to and justify this conclusion. It appears that Mrs. Hume, at the time she became the wife of Mr. Hume, was the daughter of a man of considerable means, Mr. Pickrell, owning an estate near the city; that she is an only child, and that after the marriage Mr. Hume and his family lived mostly at that estate, scot free, unless he contributed from his grocery establishment something to his support. In fact the whole family lived there as if he had been born into it. Mr. Pickrell, and after his death, Mrs. Pickrell and Mrs. Hume, placed in him the most unreserved confidence. Mr. Pickrell endorsed for him, and, after his death, Mr. Hume became his administrator; whatever he collected out of the estate for the benefit of Mrs. Pickrell, went into his business.

I know it is said that Mr. Hume was guilty of dishonesty, if not crime. But it is to be remembered that he was not a wasteful man, that he did not dissipate his time, that he appears to have been devoted to his business, and that if he took anything, either from the estate of Mr. Pickrell or from anybody else, it was for the benefit of that business, and he did all he could to keep up the sinking ship.

Having these relations with the family, and having encroached somewhat, I will not say how extensively, upon the patrimony of the wife, I think without going very far we can find a proper motive that he had in effecting these insurances for his wife and family, and we do not think it is

49

the duty of a court of equity to bring a telescope to examine his mind closely for some motive that would render these transactions void or fraudulent, when there is a motive so apparent on the face of it. The law recognizes the natural love and affection of a husband for his wife and family, and any settlements he makes upon them will be upheld, without any other consideration whatever, if they are free from fraud.

It is said that these insurances provided an unreasonable amount and exhibit clearly the recklessness with which the intestate disregarded the claims of his creditors. In this connection, we are also reminded that Mrs. Hume herself is a lady of fortune; that she is the heir of her father and her mother; that her mother has a life estate in the property, and that she will inherit the whole of it upon her death, and inventories have been read to show that this estate is one of very considerable value. Mrs. Hume has not obtained the estate yet, and perhaps that is a sufficient answer. Another is, that its value is prospective, and what will be its value at the termination of the life estate is difficult to determine at present. In addition to all that, there are endorsements of Mr. Pickrell outstanding, and what may be the fate of those endorsements, it is impossible to conjecture. So that the matter is not in any way clear that Mrs. Hume will have a large estate independent of the policies. But suppose she has a moderate fortune of her own, one that would amply support her and her family by economy, is that any business of the creditors? What right have they to any portion of her separate estate to pay her husband's claims? The law says that they have none whatever. Considerations of that character should not weigh in the final adjudication of this case, if we give these creditors all they are entitled to.

It must be admitted that Thomas Hume at the time he effected the last three policies of insurance was hopelessly insolvent. We think that is a very doubtful fact with regard to the first policy which was taken out in 1873, and by looking over the schedules furnished by counsel,

we should say that his insolvency is not established at an earlier date than 1874; and from that time onward to the point of his death, Mr. Hume was undoubtedly unable to meet the claims of his creditors, and that from that time he had no right in law to take from his means any property for the benefit of his family, as a settlement. But we can give the creditors every just right, every dollar they are entitled to, and give the widow and the children the benefit of the contract which was made for them; and we have no more right to transfer the proceeds of these policies to the creditors than we would have to take Mrs. Hume's interest in Tunlaw for the same purpose.

The money has been paid into court. The decree must be entered decreeing the money to Mrs. Hume, and charging her with the amount of all the premiums that were paid upon the three policies from February, 1874, which is the proper time to adopt as the period when Mr. Hume's insolvency clearly appears.